NORRIS, Circuit Judge,
with whom FLETCHER, FERGUSON and REINHARDT, Circuit Judges, join dissenting.
Article III of the Constitution provides that “[t]he judicial Power of the United States” shall be exercised by judges whose independence from the political branches of government is assured by guarantees of life tenure and undiminished compensation. Today, our Court carves out an exception to this explicit and unqualified constitutional command by holding that the judicial power of the United States may be exercised by judges who serve at the pleasure of the President and the Senate. As Professor Freund aptly commented, every recess appointee sits with “one eye over his shoulder on Congress.” Harvard Law School Record, October 8,1953, p. 1, col. 5. He has no assured tenure beyond the next session of the Senate.
I agree with the majority that there is a direct conflict between the Recess Appointments Clause of Article II and the tenure and salary provisions of Article III of the Constitution. I also agree with the majority that in deciding which clause should prevail, we must look beyond the Constitution itself. As the majority observes, the text gives us “no reason to favor one article over the other.”
Nor do the contemporaneous writings of the Framers of the Constitution shed much light on the issue. The Federalist and other sources overflow with references to the importance of an independent judiciary as a corollary of the very centerpiece of the constitutional plan — the separation of powers. But the records of the constitutional era tell us virtually nothing about the Recess Appointments Clause or how it was to interact with the tenure and salary provisions of Article III.
*1015 My major point of disagreement with the majority is its reliance upon the executive’s practice of making recess judicial appointments as virtually the sole basis for its conclusion that the practice is constitutional. In my vjew, the majority skips what I believe should be a crucial step in the constitutional inquiry: evaluating and balancing the competing constitutional values at stake. Because of its uncritical acceptance of the historical practice as determinative of the constitutional issue, the majority fails to make any serious comparative analysis of the concerns for governmental efficiency underlying the Recess Appointments Clause and the principle of judicial independence underlying the tenure and salary provisions of Article III.
We need only look to recent history to appreciate that there is genuine tension between the values underlying the two opposing constitutional provisions. President Eisenhower’s recess appointments to the Supreme Court of Chief Justice Earl Warren in 1953 and Justice Brennan in 1956 both created controversy about the legitimacy of recess appointments to that Court. Senator Joseph McCarthy’s public interrogation of Justice Brennan while the latter was a sitting Justice of the Court tells its own cautionary tale:
Senator McCarthy. You, of course, I assume, will agree with me and a number of the members of the committee— that communism is not merely a political way of life, it is a conspiracy designed to overthrow the United States Government.
Mr. Brennan. Will you forgive me an embarrassment, Senator. You appreciate that I am a sitting Justice of the Court. There are presently pending before the Court some eases in which I believe will have to be decided the question what is communism, at least in the frame of reference in which those particular cases have come before the Court.
I know, too, that you appreciate that having taken an oath of office it is my obligation not to discuss any of those pending matters. With that qualification, whether the label communism or any other label, any conspiracy to overthrow the Government of the United States is a conspiracy that I not only would do anything appropriate to aid suppressing, but a conspiracy which, of course, like every American, I abhor.
Senator McCarthy. Mr. Brennan, I don’t want to press you unnecessarily, but the question was simple. You have not been confirmed yet as a member of the Supreme Court. There will come before that Court a number of questions involving the all-important issue of whether or not communism is merely a political party or whether it represents a conspiracy to overthrow this Government.
I believe that the Senators are entitled to know how you feel about that and you won’t be prejudicing then any cases by answering the question.

Hearings Before the Senate Committee on the Judiciary on Nomination of William Joseph Brennan, Jr.: 85th Cong., 1st Sess., 17-18 (1957).

Even before Justice Brennan’s ordeal, the recess appointment of Chief Justice Warren provoked what seems to have been the first scholarly comment concerning the constitutionality of such appointments.[1] The Warren appointment occurred after Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), was originally argued to the Supreme Court but before reargument actually took place. In response to the Warren appointment, the eminent constitutional scholar Professor Henry M. Hart, Jr. warned that for Warren to take his seat and decide cases before his confirmation by the Senate would “violate the spirit of the Constitution, and possibly also its letter.” Harvard Law School Record, October 8, 1953, p. 2, col. 2. Professor Hart noted that Warren’s permanent appointment would be
*1016 subject to three future contingencies: (1) the decision of the President to forward his nomination to the Senate; (2) the decision of the President not to withdraw the nomination before it has been acted upon; and (3) the decision of the Senate to confirm the nomination. The Senate will be entirely free ... to postpone its action until near the close of the session in order to see how the new nominee is going to vote.
Id. Hart then stated, “I cannot believe that the Constitution contemplates that any Federal judge ... should hold office, and decide cases, with all these strings tied to him.” Id. Recognizing that, as the majority here stresses, recess appointments had been made in the past and that Attorneys General had assumed such appointments to be valid, Hart stressed that “occasional practice backed by mere assumption cannot settle a basic question of constitutional principle.” Id. Looking to “the spirit and purpose of the Constitution,” Hart observed,
the impropriety [of recess appointments to the federal judiciary] becomes unmistakable. On few other points in the Constitutional Convention were the framers in such complete accord as on the necessity of protecting judges from every kind of extraneous influence upon their decisions.
Id. Hart concluded, a judge
cannot possibly have this independence if his every vote, indeed his every question from the bench, is subject to the possibility of inquiry in later committee hearings and floor debates to determine his fitness to continue in judicial office.
Id. The majority today all but ignores the careful analysis of constitutional purposes and values that Professor Hart obviously believed was critical to resolution of the tension between Article III and the Recess Appointments Clause.
To be sure, the executive’s practice of vesting recess appointees with Article III power has a long and impressive historical pedigree, but the majority indiscriminately defers to this practice as dispositive of its constitutionality. In my view, such uncritical acceptance of a practice as a basis for judging its constitutionality is inconsistent with the judiciary’s historic role as the final arbiter of the constitutionality of the actions of the political branches of government. Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). To make my point that the majority allows practice to play an exaggerated role in its constitutional analysis, I will employ a four-step inquiry. First, I will review the text of the Constitution. Second, I will examine the contemporaneous writings of the Framers as they pertain to the two clauses in question. Third, I will weigh the competing values that animate the two clauses. Finally, after discussing the role of historical practice as a factor in constitutional analysis generally, I will consider the specific practice of making recess judicial appointments as a factor in deciding the constitutionality of that practice.
I. THE CONSTITUTIONAL TEXT
The Constitution presents us with ■ two separate and contradictory clauses, one in Article II and one in Article III, each clear and unambiguous on its face. The Recess Appointments Clause, Article II, section 2, provides:
The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session.

U.S. Const., art. II, § 2, cl. 3.

When read in light of a preceding clause, U.S. Const, art. II, § 2, cl. 2, which gives the President the general power to “appoint Ambassadors ..., Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for ...,” the language of Article II seems to empower the President to grant recess commissions to fill judicial vacancies.
Article III, on the other hand, seems equally clear that only persons with the independence secured by life tenure and protection against diminished compensation *1017 may exercise the judicial power of the United States. The relevant portion of Article III states simply and unconditionally,
The judicial Power of the United States, shall be vested in one supreme Court, and jn such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services a Compensation, which shall not be diminished during their Continuance in Office.
US. Const. art. Ill, § 1. On its face, this language admits of no exception; its command is that only judges with Article III protections may wield Article III power.
Hence, we face an extraordinary situation: a direct conflict between two provisions of the Constitution. No accommodation seems possible; one clause must yield to the other. The majority, in holding that Judge Heen could serve as an Article III judge without possessing Article III protections, resolves the conflict in favor of the Recess Appointments Clause. In doing so, it necessarily reads into the unambiguous language of Article III an exception for recess appointees. I recognize, of course, that the converse is also true: to hold that the Recess Appointments Clause does not apply to Article III judges would in turn mean reading an exception into that clause. That, in the last analysis, is the choice I believe we should make.
Because I agree with the majority that the tension between these two contradictory provisions cannot be resolved solely by reference to the Constitution itself,[2] I turn next — as we customarily do when the meaning of the Constitution is not clear from its text — to the contemporaneous writings that reflect the thinking of the Framers. Unfortunately, those sources also fail to tell us which of the two competing clauses the Framers intended to prevail over the other.
II. THE CONTEMPORANEOUS WRITINGS
The contemporaneous writings of the Framers are virtually barren of any references to the Recess Appointments Clause. Although the record contains a few scattered references to the Clause, it was never explained, debated or discussed in any meaningful way. See Note, Historical Practice at 1766-73; Note, Recess Appointments at 126-130. Other than the text of Article II, Section 2 itself, all we know is that the Clause was proposed just ten days before the end of the Constitutional Convention and was adopted without debate. 2 Farrand, The Records of the Federal Convention of 1787 540 (1911); C. Rossiter, 1787: The Grand Convention 224 (1966).
Even The Federalist, normally a fruitful source of information on the thinking of the Framers, is almost silent on the subject of the President’s power to make recess appointments. The Federalist, No. 76, quotes the Clause itself but fails to mention the judicial branch of government.[3] Although The Federalist, No. 78, does state that the “mode of appointing the judges ... is the same” as that “fully discussed in the two last numbers,” id. at 503, “the two last numbers” of The Federalist, Nos. 76 and 77, which were concerned with the appointment of other federal officers, include no reference to the Re *1018 cess Appointments Clause other than its verbatim quotation at the outset of No. 76.
In contrast to the paucity of comments on the Recess Appointments Clause by the Framers, the historical record is a cornucopia of references to the principle of life tenure enshrined in Article III. History makes absolutely clear the supreme importance the Framers attached to an independent judiciary as a vital corollary to the fundamental concept of the constitutional plan, the separation of powers.
The experience of the Framers with the colonial judiciary had not been a happy one. The signers of the Declaration of Independence charged that the King “obstructed the Administration of Justice by refusing his Assent to Laws for establishing Judiciary Powers. He has made Judges dependent on his Will alone for the tenure of their office and the amount and payment of their salaries.” The Declaration of Independence para. 11-12 (U.S.1776). The Framers recognized that these protections, when embodied in the Act of Settlement of 1701, had previously freed English judges from royal control. To translate their concern for judicial independence into practice, the Framers included in Article III the requirement that federal judges have permanent tenure and undiminishable compensation. See Pittman, The Emancipated Judiciary in America: Its Colonial and Constitutional History, 37 A.B.A.J. 485, 588 (1951). The Framers were determined to ensure that federal judges would not be beholden to the executive or the legislature but only to the law and their own consciences.
In contrast with the dearth of references to the Recess Appointments Clause, the contemporaneous writings overflow with commentary on the fundamental importance of permanency in office as the cornerstone of an independent judiciary. Alexander Hamilton, writing as Publius, eloquently expressed the concerns of the Framers:
[A]s liberty can have nothing to fear from the judiciary alone, but would have everything to fear from its union with either of the other departments; that as all the effects of such a union must ensue from a dependence of the former on the latter, notwithstanding a nominal and apparent separation; that as, from the natural feebleness of the judiciary, it is in continual jeopardy of being overpowered, awed or influenced by its coordinate branches; and that as nothing can contribute so much to its firmness and independence as permanency in office, this quality may therefore be justly regarded as an indispensable ingredient in its constitution, and, in a great measure, as the citadel of the public justice and the public security.
The Federalist, No. 78 at 504-05 (emphasis added).
Hamilton also articulated the Framers’ belief that life tenure was necessary to ensure that the judiciary would play its crucial role as the guardian of individual liberty against the power of government:
If then, the courts of justice are to be considered as the bulwarks of a limited Constitution against legislative encroachments, this consideration will afford a strong argument for the permanent tenure of judicial offices, since nothing will contribute so much as this to that independent spirit in judges which must be essential to the faithful performance of so arduous a duty.
The Federalist, No. 78 at 508. Thus, the letter as well as the spirit and guiding intention of Article III is inconsistent with the exercise of judicial power by recess appointees whose tenure is dependent upon both political branches of government.[4]
In sum, the Framers left us an abundance of commentary on Article III, but only a few scattered general references to the Recess Appointments Clause. The only explicit reference to the interaction of the *1019 two provisions is in Edmund Randolph’s letter to the Virginia House of Delegates explaining his reasons for not signing the proposed Constitution transmitted to the states by the Constitutional Convention. 3 Farrand, supra, 123-27.
In his letter, Randolph argues that the Constitution had created an excessively powerful executive, citing as partial evidence for this view his belief that the Recess Appointments Clause gave the President the power of conferring judicial commissions during the recess of the Senate. There is no evidence, however, that Randolph’s comments about the Recess Appointments Clause in this letter represented anything other than the temporary position of a volatile political figure whose “gyrations” regarding both the value and meaning of the Constitution are well known to historians. See, J. Main, The Anti-Federalists: Critics of the Constitution, 1781-1788 257 (1961). By the time of Virginia’s state convention on the Constitution, Randolph had so far banished his earlier doubts regarding the Constitution that he had actually become one of its “staunchest supporters.” G. Bancroft, History of the Formation of the Constitution of the United States 316 (1882).
Contrary to the impression created by his letter, Randolph stated at the Virginia convention that the powers of the President were in all respects carefully circumscribed: “He can do no important act without the concurrence of the Senate.” 3 J. Elliott, The Debates in the Several State Conventions on the Adoption of the Federal Constitution, 201 (1907) (5 vols.) [hereinafter cited as Elliott’s Debates]. He attacked the provisions for the appellate jurisdiction of the federal judiciary, but he maintained that judicial independence had been adequately guaranteed. 3 Elliott’s Debates 205. Despite the fact that Randolph consistently highlighted the flaws in the Constitution for the benefit of his fellow members of the Virginia state eonvention, he never repeated his original concern about the Recess Appointments Clause, even on the day the Clause was read aloud to the Virginia convention.[5] In fact, the Virginia convention did not discuss the Clause at all. 3 Elliott’s Debates. As at the other state conventions, the only doubts raised at the Virginia convention about the independence of the judiciary stemmed from the fact that the Constitution did not prohibit augmentation of judicial salaries, not from the Recess Appointments Clause. 3 Elliott’s Debates 517.
Other than Randolph’s letter, there is no evidence in any of the extant records of the Constitutional Convention or of the various state conventions that the Framers intended the Recess Appointments Clause to apply to the judiciary. See Farrand, The Records of the Federal Convention of 1787 (1911); J. Strayer, The Delegate from New York (1939) (Constitutional Convention Notes of John Lansing, Jr.); Hutson, “John Dickinson at the Federal Constitutional Convention,” 40 William and Mary Quarterly 256 (1983); Elliott, The Debates in the Several State Conventions on the Adoption of the Federal Constitution (1907). For all the record shows, the Framers’ attention was never focused on the conflict. If it did occur to them, it was not mentioned in the debates. As one commentator concludes, “The legislative history of article III and of the recess appointments clause reveals no specific intent on the part of the framers regarding how the two provisions would interact.” Note, Historical Practice at 1768.
Thus, the contemporaneous writings contain scant mention of the Recess Appointments Clause. They do contain extensive commentary on Article III, but with the isolated exception of Randolph’s letter, the contemporaneous writings do not address the relationship between the two clauses. As one scholarly commentary concluded:
*1020 Although the legislative history of the recess appointments clause arguably supports extending the clause to vacancies in the federal judiciary, this evidence must be balanced against the heavy emphasis that article Ill’s legislative history places on the value of judicial independence. Taken together, therefore, the legislative history of the two provisions is equally capable of supporting either of two interpretations: that the recess appointments clause was intended as a limited exception to article Ill’s tenure and salary provisions, or that the tenure and salary provisions are absolute requirements and the recess appointments clause was therefore not intended to extend to vacancies in the federal judiciary.
Note, Historical Practice at 1773.
III. CONSTITUTIONAL VALUES

A. The role of values in constitutional interpretation

The first step in the inquiry, examination of the constitutional text, and the second step, exploration of the contemporaneous writings, leave us with an unresolved conflict between two provisions of the Constitution and no real indication of how the Framers intended the two clauses to interact. Thus, the next step in our analysis— weighing the values that animate the two provisions — becomes a vital part of the interpretive process. Only after that step is completed will I turn to the historical practice of using the recess appointment power to fill vacancies in Article III courts. The majority, in contrast, simply omits the step of weighing the competing values, resulting in a truncated analysis based almost entirely on historical practice.
The Supreme Court has consistently observed the principle that in interpreting the Constitution, we are to be mindful of the concerns that animate its various provisions. See e.g., Virginia v. Tennessee, 148 U.S. 503, 519, 13 S.Ct. 728, 734, 37 L.Ed. 537 (1893); Legal Tender Cases, 79 U.S. (12 Wall.) 457, 531, 20 L.Ed. 287 (1870); Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 187, 6 L.Ed. 23 (1824). The classic statement was provided in Prigg v. Pennsylvania, 41 U.S. (16 Pet.) 536, 10 L.Ed. 1060 (1842):
It will, indeed, probably, be found, when we look to the character of the constitution itself, the objects which it seeks to attain, the powers which it confers, the duties which it enjoins, and the rights which it secures, as well as the known historical fact, that many of its provisions were matters of compromise of opposing interests and opinions, that no uniform rule of interpretation can be applied to it, which may not allow, even if it does not positively demand, many modifications, in its actual application to particular clauses. And, perhaps, the safest rule of interpretation, after all, will be found to be to look to the nature and objects of the particular powers, duties and rights, with all the lights and aids of contemporary history; and to give to the words of each just such operation and force, consistent with their legitimate meaning, as may fairly secure and attain the ends proposed.... If, by one mode of interpretation, the right must become shadowy and unsubstantial, and without any remedial power adequate to the end, and by another mode, it will attain its just end and secure its manifest purpose, it would seem, upon principles of reasoning, absolutely irresistible, that the latter ought to prevail.
Id. 41 U.S. (16 Pet.) at 610-12.
Inquiry into fundamental constitutional values is especially important when two provisions of the Constitution are in tension with each other. The Court’s attempt to resolve the conflict between the two religion clauses of the First Amendment illustrates the essential process of weighing competing constitutional values. The Establishment Clause and the Free Exercise Clause are both cast in absolute terms, and either of them, if expanded to a logical extreme, would tend to clash with the other. Walz v. Tax Commission, 397 U.S. 664, 668-69, 90 S.Ct. 1409, 1411-12, 25 L.Ed.2d 697 (1970). In resolving this tension, the Supreme Court attempts to strike *1021 a balance between the values implicated by the two clauses.[6] In balancing the Establishment Clause and the Free Exercise Clause,
Both the Court and various commentators have explored the historical background of the first amendment in order to guide interpretation of the two religion clauses, but here as elsewhere, “too literal [a] quest for the advice of the Founding Fathers” is often futile. The historical record is ambiguous, and many of today’s problems were of course never envisioned by any of the Framers. Under these circumstances, one can only examine the human values and historical purposes underlying the religion clauses to decide what doctrinal framework might best realize those values and purposes today.
L. Tribe, American Constitutional Law, § 14-3 (emphasis added).
Nebraska Press Ass’n v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976) — a case involving a conflict between the fair trial guarantee of the Sixth Amendment and the free press command of the First Amendment — further illustrates how the Court weighs competing values in interpreting and applying the Constitution. In Nebraska Press, the Court was confronted with a “prior restraint imposed to protect one vital constitutional guarantee and the explicit command of another that the freedom to speak and publish shall not be abridged.” 427 U.S. at 570, 96 S.Ct. at 2808. The Court adopted a balancing approach, determining “as Learned Hand put it, [whether] ‘the gravity of the “evil,” discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger.’ ” Id. at 562, 96 S.Ct. at 2804. Implicitly, Nebraska Court resolves the tension between the First and Sixth Amendfnents by balancing the values of free speech against those of fair press on a case-by-case basis. The Court concluded that the prior restraint was invalid because the state had not met the “heavy burden” required to justify a prior restraint; thus, in the particular case, the Court decided the balance favored the values embodied in the First Amendment.
We cannot adopt such a case-by-case balancing approach to resolve the tension between the Recess Appointments Clause and Article III, because the question whether recess appointees may exercise the judicial power of Article III demands a categorical yes or no answer.[7] Nevertheless, both *1022 Walz and Nebraska Press suggest that the resolution of conflict between two provisions of the Constitution requires an evaluation and balancing of underlying values. Our next step, therefore, is to evaluate and balance the competing values underlying the Recess Appointments Clause and Article III.

B. The competing values animating the two clauses

We begin the process of weighing the competing values by considering the values that animate Article III. There can be no doubt that the Framers considered the salary and tenure protections of Article III to be critical institutional safeguards of judicial independence. Recently, in Pacemaker Diagnostic Clinic of America v. Instromedix, 725 F.2d 537, 541 (9th Cir.1984) (en banc), our court reaffirmed this fundamental constitutional value: “The attributes of Article III judges, permanency in office and the right to an undiminished compensation, are as essential to the independence of the judiciary now as they were when the Constitution was framed.” The Supreme Court stressed the importance of Article III safeguards to judicial independence in Northern Pipeline Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982):
In sum, our Constitution unambiguously enunciates a fundamental principle — that the “judicial Power of the United States” must be reposed in an independent Judiciary. It commands that the independence of the Judiciary be jealously guarded, and it provides clear institutional protections for that independence.
Id. at 60,102 S.Ct. at 2866; see also United States v. Will, 449 U.S. 200, 217-18, 101 S.Ct. 471, 481-82, 66 L.Ed.2d 392 (1980) (“A Judiciary free from control by the Executive and the Legislature is essential if there is a right to have claims decided by judges who are free from potential domination by other branches of government.”).[8]
In my view, the majority simply fails to take the institutional protections of Article III as seriously as our court did in Pacemaker and the Supreme Court did in Marathon; indeed, the majority denigrates the tenure and salary provisions when it argues that there are no examples of executive or legislative coercion of a recess appointee. This rationale implies that the institutional protections of Article III are of little consequence because we can rely on the integrity and courage of individual judges to assure judicial independence. The Framers, quite obviously, did not share that view. Rather, they were firm in their conviction that permanency of office and salary protection were crucial institutional safeguards against encroachment on the judicial power by the political branches. As our court stated recently, “[0]ur own experience attests to the substance and reality of [Article Ill’s] guarantees. A separate and independent judiciary, and the guarantees that assure it, are present constitutional necessities, not relics of antique ideas.” Pacemaker, 725 F.2d at 541.
Moreover, we must preserve not only the reality but also the appearance of judicial independence. Public confidence in the integrity and independence of the courts is imperative, especially when a constitutional confrontation between the judiciary and the political branches creates a national crisis. Such confidence could be threatened if, for example, recess appointees were called upon to participate in a highly charged case involving the constitutional limits on presidential power. The facts of Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) provide a thought provoking historical hypothetical. Imagine a recess appointee sitting on a Supreme Court that was otherwise divided, four to four, on the question of the constitutionality of President Truman’s steel mill seizure. Imagine further that this hypo *1023 thetical justice is courageous and intends to vote his conscience. Were he to believe the President’s action in seizing the mills was unconstitutional, the recess appointee would confront the possibility that an infuriated President might withdraw his nomination. If, on the other hand, the justice were to believe the seizure was constitutional, he would find it difficult if not impossible to avoid the appearance that his tie breaking vote had been influenced by the President’s power to cut short his tenure on the Court. United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) is another case from our recent past in which public faith in the independence of the judiciary could have been shaken if a recess Supreme Court appointee had provided a swing vote. These historical hypo-theticals graphically illustrate the importance of the tenure and salary provisions of Article III as safeguards against institutional destabilization.
Fortunately, we have not had to confront these disturbing scenarios, because circumstances have not yet combined to produce a recess appointment to our highest court during such trying times of national crisis. There are, however, no guarantees against such an occurrence. Entrusting the decision in such cases — where the constitutional limits of presidential power are on the line — to judges whose office depends on whether the President decides to withdraw their nomination, would threaten seriously the ideal of separation of powers. Yet, if the majority’s approach prevails, it may take a crisis of the magnitude of Youngstown or United States v. Nixon to cause us to regret today’s decision.
The threat of institutional destabilization posed by recess appointments is not purely hypothetical. History informs us that during the civil rights struggle of the 1960’s, political pressures induced recess appointees to avoid politically sensitive cases. A writer of contemporary history has recounted some of the events of that turbulent period:
[Griffin] Bell and [Walter] Gewin both began service on the Fifth Circuit on October 6, 1961, with interim appointments so they could begin work on the overloaded backlog of cases. But their appointments would not become final until after confirmation hearings by the Senate Judiciary Committee and approval by the Senate the following March. At an initial meeting with [Chief Judge Elbert] Tuttle, Bell suggested that the sensitivity of race cases was such that they might create problems for Gewin at the confirmation hearings.
Tuttle agreed and said he would not assign such cases to Gewin until after confirmation and for the same reason would also withhold such assignments from Bell.
J. Bass, Unlikely Heroes 164 (1981). The difficulty with such judicial accommodation to political pressure is that it requires the-assignment process itself to depart from strict neutrality and enter the realm of political machination. Yet, a fundamental purpose of Article III was to isolate the judiciary from just such political entanglements.
The strain on judicial independence and the threat to the appearance of independence exemplified by the Fifth Circuit’s experience during the struggle for civil rights and the confrontation of Justice Brennan by Senator McCarthy are but two examples of the potentially pernicious effects of departing from the Article III mandate that judicial power be exercised only by judges with permanent tenure and protection against diminution of salary. We have no way of knowing how many other recess appointees may have been shunted away from controversial cases because they were vulnerable to political retaliation for unpopular decisions. Nor do we have any way of knowing if a judge privately succumbs to intense pressure and decides a case in a manner that ensures his confirmation rather than according to the dictates of legal principle and precedent. What we do know is that the constitutional plan of separation of powers rests on clear institutional protections for judicial independence.
*1024 The concerns for efficiency, convenience, and expediency that underlie the Recess Appointments Clause pale in comparison. The purpose served by the President’s power to fill judicial vacancies during a recess of the Senate is obviously to avoid delay in the administration of justice in federal courts. I recognize that such a recess commission allows a new judge to begin working immediately on a backlog of cases rather than waiting for the Senate to reconvene. There are ways, however, of coping with pressing caseloads without compromising the principle of judicial independence. Because district and circuit judges are largely interchangeable, interdistrict or intercircuit assignments provide an expedient and effective way of dealing with a short term problem. Such transfers are a common practice in the federal judicial system.
When it comes to the Supreme Court, different considerations might come into play. In the event of a freak accident — for example, the deaths of enough Supreme Court Justices to void a quorum — use of the executive’s recess appointment power could be one way to deal with an emergency. Congress, however, has the authority to provide for such exigencies in ways that do not compromise judicial independence. When, for example, the Supreme Court is unable to muster a quorum to hear a direct appeal from a district court, it is directed by statute to remand a case for decision by a special panel of the circuit that includes the district from which the appeal was taken. 28 U.S.C. § 2109 (1982); see also United States v. Aluminium Co. of America, 148 F.2d 416, 421 (2d Cir.1945) (example of such a special panel). Moreover, in the unlikely event of a true emergency demanding immediate action when the Supreme Court lacks a quorum, the Senate can reconvene in a matter of days, if not hours to perform its constitutional role— giving “advice and consent” to the executive’s judicial nominations.
The majority asserts that the Recess Appointments Clause is necessary to avoid “the denial of the important right of access to the courts” and to prevent “the executive from being incapacitated during the recess of the Senate”; it does not, however, cite a single instance when use of the recess appointment power was necessary to achieve those objectives. Indeed, the majority presents no evidence that any President made a recess appointment to ensure the continued functioning of the judiciary through a crisis that could not have been handled by existing Article III judges. With one exception, the federal courts have functioned since 1964 without the assistance of recess appointees. The sole exception is Judge Heen.
Thus, could we set historical practice aside, I believe our decision today would be relatively easy. Given that the language of the two clauses is in conflict and that the intentions of the Framers are unclear, the principles that animate the salary and tenure provisions of Article III — judicial independence and separation of powers — clearly outweigh the concerns of expediency and efficiency that underlie the Recess Appointments Clause. In other words, if we were writing on a clean slate, if we were reviewing Judge Heen’s recess commission without history to support it, I find it inconceivable that we would interpret the Constitution as the majority does today — subordinating Article III values to the executive’s general power to make recess appointments. With that thought in mind, I turn to the role of historical practice in the constitutional equation.
IV. HISTORICAL PRACTICE
The fourth step of the inquiry — factoring the historical practice of recess judicial appointments into the constitutional analysis — brings into sharp relief the majority’s almost exclusive reliance on a unilateral practice of the executive as the justification for finding the practice to be constitutional.

A. The judicial role: Evaluation of historical practice

In two recent cases, Immigration and Naturalization Service v. Chadha, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), and Marsh v. Chambers, 463 U.S. *1025 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), the Supreme Court developed an analytic framework for evaluating historical practice in constitutional interpretation. Cha-dha teaches us that even a long historical pedigree does not conclusively establish the constitutionality of a practice. Marsh illustrates that in limited circumstances historical practice may be an accurate guide to the intentions of the Framers. The two cases together establish the principle that the courts must critically evaluate a historical practice before deciding how much weight to accord it in the process of interpreting the Constitution.
In Chadha, the Supreme Court resolved a conflict between historical practice and the principle of separation of powers, analogous to the conflict we confront today. At issue was the constitutionality of a statute authorizing one house of Congress to invalidate by resolution a decision of the executive branch made pursuant to con-gressionally delegated authority. When the Court decided Chadha, the one-house veto was a practice of long and continuous standing. See Chadha, 103 S.Ct. at 2793 (White, J., dissenting). Yet, that fact did not deter the Court from declaring the practice unconstitutional. In fact, Chief Justice Burger noted that “our inquiry is sharpened rather than blunted by the fact that Congressional veto provisions are appearing with increasing frequency in statutes which delegate authority to executive and independent agencies .... ” Chadha, 103 S.Ct. at 2781. The teaching of Chadha is clear. Historical practice is not irrelevant to Constitutional inquiry, but it will not “save [a practice] ... if it is contrary to the Constitution.” Id. 103 S.Ct. at 2781.
Chadha does not, I hasten to add, stand for the proposition that historical practice has no role to play in constitutional interpretation. Indeed, Marsh v. Chambers is authority that a practice with a lineage that can be traced back to the time of the Framers may serve as a guide to the Framers’ understanding of the workings of the Constitution. But Marsh also illustrates the proposition that rather than simply accepting the historical practice, courts should evaluate carefully a historical practice dating back to the Framers before deciding its constitutionality.
In Marsh, the Court held that the Nebraska legislature’s practice of opening each session with a prayer offered by a state-paid chaplain did not violate the Establishment Clause. In reaching that decision, the Court considered the practice of the First Congress, which not only appointed the first legislative chaplain but also drafted and recommended the Bill of Rights for adoption by the states. The Court cited to a uniquely full historical record indicating that the practice was extensively considered and approved by the Framers. Id., 103 S.Ct. at 3335. The bill to appoint a legislative chaplain was extensively debated by the First Congress. Indeed, the bill was opposed by John Jay and John Rutledge on First Amendment grounds. The Court in Marsh cited this unique record of debate and opposition as evidence that the “subject was considered carefully and the action not taken thoughtlessly .... ” Id. Thus, the teaching of Marsh is that historical practice is only to be given decisive weight if it is “infuse[d] ... with power” by the considered judgment of the Framers following careful debate. Id.
The majority apparently reads Marsh as authority for according great weight to the practice of making recess judicial appointments because the practice also dates back to the administration of George Washington. In doing so, the majority overlooks the Marsh Court’s careful evaluation of the context and characteristics of the practice of appointing legislative chaplains before accepting it as a reliable guide to constitutional meaning. Only after stressing that the practice was carefully debated and adopted by the First Congress, and that the First Congress drafted and proposed the Bill of Rights, did the Court accord the practice substantial weight in interpreting the First Amendment. Id. Chadha illustrates the corollary of Marsh: even longstanding historical practice should receive *1026 little deference if it sheds no light on the intentions of the Framers.

B. Historical practice and the Framers’ intent: No record of considered deliberation

Thus our task is to evaluate critically the historical practice of recess judicial appointments. The majority treats this case as if Marsh were controlling rather than Cha-dha. I recognize that the practice we consider today is similar to the practice the Court evaluated in Marsh in one important respect: it stretches back to the time of the Framers. There is, however, an equally important difference. President Washington’s use of the recess appointment power to confer interim judicial commissions is not accompanied by a record of considered deliberation that gives us meaningful insight into the intentions of the Framers.
In this critical respect, a close comparison of the case here with Marsh is instructive. In the case at hand, the historical record fails to inform us whether that the Framers considered the possibility that recess appointments could violate Article III. Indeed, the majority is careful to observe that these appointments by President Washington were made without objection or apparent consideration of the potential conflict with Article III.[9] This blank record stands in sharp contrast with the full record of plenary consideration given by the First Congress to the First Amendment implications of appointing a legislative chaplain. Thus, the early historical practice of recess appointments to the judiciary has not been “infused with power” by the considered judgment of the Framers. As Marsh suggests, such a practice is entitled to less deference than a practice that we know was “considered carefully” by the Framers. Marsh, 103 S.Ct. at 3335.
Moreover, the first legislative chaplain was appointed by the very same body — the First Congress — that proposed the Bill of Rights. There is no reason to credit George Washington with any special insight into how the Framers intended the recess appointment power of Article II to interact with the salary and tenure provisions of Article III.
There is a ready explanation as to why the public record does not reflect that President Washington’s recess judicial appointments were subject to the same careful scrutiny as was the appointment of a legislative chaplain by the First Congress. Unlike the practice approved by the collective action of Congress in Marsh, the use of the recess appointment power to confer interim judicial commissions involves the unilateral action of individual Presidents. Although Congress may ultimately confirm a recess appointee, it has no authority or opportunity to review the President’s exercise of his recess appointment power because an interim commission is simply not subject to Senate approval.
The distinction between the unilateral historical practice of the executive and the collective actions of the Congress becomes important in the process of assessing the interpretive weight of the practice. Congress is a deliberative body composed of peers. An action taken by Congress almost necessarily is subject to constitutional challenge and reasoned debate by the members of that body. A unilateral action by the President, in contrast, can be implemented without debate or discussion. Although the majority is correct in observing that Alexander Hamilton and John Jay were members of Washington’s first cabinet, the historical record does not tell us whether Hamilton and Jay had even considered the question whether Article III limited the executive’s recess appointment power to non-judicial offices, or, if they did, whether they had occasion to express their views, whatever they may have been, in the privacy of a Cabinet meeting or in conversation with the President alone.
What we do know is that Hamilton and Jay were faced with different concerns as *1027 members of Washington’s cabinet than they were as architects of the Constitution and authors of The Federalist. Members of a cabinet have political agendas, and the fact that they may not have spoken out against a recess judicial appointment does not necessarily mean that they considered it to be constitutional. As members of a national administration, they very well may have been preoccupied with other matters deemed more pressing at the time; they were, after all, faced with a wide range of problems as members of the first administration of a new government. Voicing objection about the constitutionality of recess judicial commissions may not have been very high on their political agenda. Moreover, the realities of getting the job done and accommodating various contending factions do not lend themselves to the same process of reasoned deliberation and debate as did the framing of our fundamental charter or of the Bill of Rights. Finally, members of either political branch are not in the same position as sitting Article III judges faced with a decision affecting the interests of real parties engaged in a concrete dispute.
Recently, Justice Rehnquist cited a clear example of the dramatic change in attitude toward the meaning of the Constitution that can accompany an individual’s switch in roles from holding office in one of the political branches to the judiciary:
[I]n the fall of 1864, the constitutionality of the so-called “greenback legislation” which the government had used to finance the war effort was headed for a Court test, and Lincoln was very much aware of this fact. He decided to appoint his Secretary of the Treasury, Salmon P. Chase, who was in many respects the architect of the greenback legislation, saying to a confidant that “We wish for a Chief Justice who will sustain what has been done in regard to emancipation and the legal tenders. We cannot ask a man what he will do, and if we should, and he should answer us, we should despise him for it. Therefore, we must take a man whose opinions are known” 2 Warren 401.
Address by Associate Justice Rehnquist, “Presidential Appointments to the Supreme Court,” University of Minnesota College of Law (October 19, 1984) (reported in N.Y. Times, October 20, 1984 § 1, at 1, 9.). As Justice Rehnquist reports, the changed attitude that accompanied Chase’s new role thwarted Lincoln’s intentions:
The ultimate irony in Lincoln’s effort to pack the Court was the Court’s first decision in the so-called Legal Tender Cases, Hepburn v. Griswold, 8 Wall. 603 [19 L.Ed. 513]. In 1870 the Court held, in an opinion by Chief Justice Chase, who had been named Chief Justice by Lincoln primarily for the purpose of upholding the greenback legislation, that this legislation was unconstitutional_ Chief Jus-
tice Chase’s vote in the legal tender cases is a textbook example of the proposition that one may look at a legal question differently as a judge than one did as a member of the Executive Branch. There is no reason to believe that Chase thought he was acting unconstitutionally when he helped draft and shepherd through Congress the greenback legislation, and it may well be that if Lincoln had actually posed the question to him before nominating him as Chief Justice, he would have agreed that the measures were constitutional. But administrators in charge of a program, even if they are lawyers, simply do not ponder these questions in the depth that judges do, and Chase’s vote in the legal tender cases is proof of this fact.
Id. Even if Hamilton and Jay — in their capacity as members of the first Cabinet— had directly confronted the question of the constitutionality of recess appointments to the judiciary, they would not have faced a concrete controversy exposed to the light and heat of the adversarial process.[10]
*1028 To sum up, Marsh establishes that a lineage that began with the Framers is a necessary condition that must be met for a historical practice to be considered a reliable guide to the intentions of the Framers. Just as clearly, however, such a lineage is not a sufficient condition. If the Framers adopted a practice carelessly or without attention to a possible constitutional infirmity, then the lineage is entitled to little weight in constitutional analysis. Although the practice of recess judicial commissions does stretch back to the time of the Framers, there is no record that the practice was adopted through a process of reasoned deliberation. After evaluating the practice in light of the standards applied by the Supreme Court in Marsh and Chadha, I cannot escape the conclusion that the early historical practice is not a reliable indicator that the Framers intended the recess appointment power to extend to vacancies in Article III courts.

C. Historical practice and structural accommodation: Judicial silence and individual liberties

Even though the historical practice of recess judicial appointments is not an accurate guide to the Framers’ intentions, it could still be argued that the judiciary should defer to the executive’s longstanding practice on the theory that it constitutes a “structural accommodation” between the various branches of government. One commentator articulated the theory as follows:
Because the Constitution is a broad charter of government and not a statute, it establishes a flexible framework for the exercise of national power. The legislative, executive, and judicial branches are not hermetically sealed units with exactly defined powers, but are interlocking spheres of influence, each with a core of constitutionally assigned functions and enumerated powers. Thus, situations arise in which it is charged that one branch’s interpretation of the scope of its authority exceeds the limits imposed by either the constitutional text or structure. In such situations, it may be possible to show that similar exercises of power have occurred repeatedly in the past and have not been challenged or openly opposed by the other two branches. A court may be offered this evidence with the argument that historical practice has “settled” the constitutional question at, issue, regardless of whether the practice took place early enough in the nation’s history to be capable of providing evidence of original intent.
Note, Historical Practice, at 1777-78. The Supreme Court’s decision in Chadha establishes that the mere fact that historical practice is of long standing does not relieve the judiciary of the responsibility of assessing the practice and measuring it against constitutional standards. In the case at hand, two reasons emerge for concluding that the historical practice of recess judicial appointments is not entitled to judicial deference as evidence of a “structural accommodation”. First, judicial silence cannot be interpreted as acquiescence in the constitutionality of a practice because Article III courts cannot react to an encroachment on their separate powers until presented with the issue in a concrete case or controversy. Second, because Article Ill’s tenure and salary provisions are designed as safeguards of individual as well as institutional interests, the courts have a duty to prevent erosion of those safeguards that transcends the structural importance of an independent judiciary.
1. Inaction by the judiciary cannot represent acquiescence in a structural accommodation. — The judiciary’s role in our system of checks and balances is a passive one. Because of the case or controversy requirement of Article III, federal courts can only act when a dispute is presented to them by parties with a concrete stake in the outcome. The courts do not initiate law suits; rather they react to actions filed by parties. Even when deciding cases or controversies, “the judicial branch acts primarily on the litigants before the court.” Pacemaker, 725 F.2d at 542.
*1029 In contrast, the political branches, the legislature and the executive, are both active. Both the President and Congress have the power to initiate action to define operationally their role in the constitutional scheme of separate and divided powers. Thus, historical acquiescence of the political branches in a practice of uncertain constitutional validity can arguably be defended as a “structural accommodation” that ought not be upset by the courts. Cf. Note, Historical Practice, at 1773. With the political branches, this “structural accommodation” can, at least to some extent, be inferred from silent acceptance by one political branch in the face of action by the other. The important distinction is that silence by the courts cannot be construed as acquiescence in the constitutionality of even a longstanding practice.
This distinction sheds light on two cases cited by the majority for the broad proposition that historical practice is entitled to judicial deference. It is true that in United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936), the Court did in part rely on historical practice in upholding the Congressional delegation to the President of the power to declare illegal the provision of arms to nations involved in the Chaco conflict. Id. at 327-29, 57 S.Ct. at 224-25. J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624 (1928), also involved a constitutional challenge to the delegation of power by Congress to the executive.[11] Because both cases involve the constitutionality of Congressional delegations of authority to the President, they are distinguishable from the instant case, which involves the independence of the passive branch, the judiciary.[12]
In sum, in our constitutional system the judiciary is entrusted with the ultimate responsibility for interpreting the Constitution, including the authority to review the constitutionality of actions by the political branches of government. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 *1030 (1803). Thus, the brute historical fact that the executive or legislature has engaged in a practice, even for an extended period, cannot by itself establish the constitutionality of the practice. This is as it must be in the constitutional scheme of things. Because the judicial branch is passive, it cannot react to an assertion of power by the political branches until third parties present the courts with a concrete case or controversy. Judicial silence simply cannot be construed as judicial acquiescence.
2. Judicial deference to structural accommodation is not appropriate when individual rights are at stake. — There is a second reason that the historical practice of recess judicial appointments should not receive deference from the courts as a structural accommodation. Article Ill’s protections were not only designed to protect the judiciary as an institution; the constitutional guarantees of life tenure and undiminished compensation were also intended to protect individuals. Justice Douglas emphasized this important function of Article III when he wrote, “The safeguards accorded Art. Ill judges were designed to protect litigants with unpopular or minority causes or litigants who belong to despised or suspect classes.” Palmore v. United States, 411 U.S. 389, 412, 93 S.Ct. 1670, 1684, 36 L.Ed.2d 342 (1973) (Douglas, J., dissenting); see also Glidden v. Zdanok, 370 U.S. 530, 536, 82 S.Ct. 1459, 1465, 8 L.Ed.2d 671 (1962). Justice Douglas’ point was recently reinforced by our court, when we observed:
[Separation of powers protections, in some cases, have two components. One axis reaches to the person affected by government action and encompasses his or her relation to a constitutional branch; the other axis runs from each governmental branch to the others to insure separation and independence in the constitutional structure.
Pacemaker Diagnostic Clinic of America v. Instromedix, 725 F.2d 537, 541 (9th Cir.1984) (en banc). In Pacemaker, we concluded that, subject to limited exceptions, the federal litigant has a personal right to demand Article III adjudication. See Pacemaker, 725 F.2d at 541.
Pacemaker upheld the constitutionality of the Magistrates Act, which authorized adjudication by magistrates without Article III protections but with the consent of the parties. Id. at 542. We also noted in Pacemaker that the Supreme Court had expounded on the existence of other limited exceptions to Article III in Marathon, but none of those exceptions applies here. Id. at 541.[13] Moreover, we expressly negated any implication that our decision in Pacemaker reached criminal cases. Id. In cases involving a criminal defendant, Article III protections should be most zealously observed because individual liberty is directly at stake. Today’s decision represents the first time any court other than the Second Circuit in United States v. Allocco, 305 F.2d 704 (2d Cir. 1962), has sanctioned the adjudication of a criminal case in an Article III court by a judge without Article III protections.
In sum, whatever role a process of structural accommodation may have to play in adjusting the relationship between the political branches, it is clear that judicial silence in the face of action by the executive or legislative branches cannot be construed as a waiver of the constitutional rights of individuals.[14] Our system affords each in *1031 dividual litigant the opportunity to vindicate his or her personal rights through the judicial process. The political branches cannot extinguish such rights by establishing “adverse possession” through longstanding historical practice.
In cases where individual rights are at stake, the Supreme Court has not hesitated to affirm fundamental constitutional principles and vindicate those rights even in the face of an intimidating historical practice. One of the most renowned such cases is Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).[15]
In Brown, the Supreme Court overturned the hoary historical practice of segregation, long rationalized by courts under the “separate but equal” doctrine. The Brown Court faced a practice that not only had “been inextricably woven into the fabric of our nation,” in the words of today’s majority, but had received the imprimatur of the Supreme Court itself. See Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). Racial segregation began at a time when the drafters of the Fourteenth Amendment were still alive; indeed the same Congress that authored the Fourteenth Amendment segregated the schools in the District of Columbia. See R. Berger, Government by Judiciary 117-33 (1977). But the Supreme Court in Brown was not daunted by the undisputed fact that the historical practice of racially segregating schools had been accepted as consistent with the Constitution for generations. The Brown Court realized that constitutional tradition demands that the courts look beyond the fact of historical acceptance when a practice is challenged as unconstitutional. Our constitutional heritage requires courts to look to the values and principles that breathe life and meaning into the words of the Constitution. When those principles demanded that segregation be struck down as inconsistent with the constitutional mandate of equal protection of the laws, the Brown Court did not hesitate to vindicate the Constitution, despite a formidable combination of historical practice and longstanding precedent. As one commentator concluded, “Brown v. Board of Education *1032 clearly demonstrates that even a long, widespread, continuous, and judicially approved. practice, in an area of doubtful constitutional meaning, will receive no judicial deference as evidence of a structural accommodation when it is alleged to have resulted in a denial of individual liberties.” Note, Historical Practice, at 1783.
The individual rights component of Article III thus provides a second distinction between the historical practice of recess judicial appointment from the historical practices considered in the majority’s cases, Curtiss-Wright and J. W. Hampton.[16] As I have already noted, Curtiss-Wright and J.W. Hampton both involved the constitutionality of Congressional delegation of power to the President. Neither case implicated individual rights.
Thus, my evaluation of the early historical practice of making recess judicial appointments leads me to conclude that, while the practice offers some support for the majority’s decision that the Recess Appointments Clause carves out an exception to Article III, the strength of that support is quite limited. Recess appointments are unilateral actions by the President; they lack the deliberative quality that gives increased weight to the early enactments of the First Congress. The original recess appointments by President Washington were apparently made without the open debate and discussion that would have “infused them with power” in the language of Marsh. Moreover, less weight should be given to the historical practice of recess appointments to the judiciary than was given to the historical practice of delegating power to the President in Curtiss-Wright and J.W. Hampton, because those cases involved “structural accommodations” between the active political branches rather than with the judiciary, the passive branch. Finally, recess judicial appointments implicate individual as well as institutional interests. Even when the political branches alone are involved, Chadha informs us that longstanding historical practice is not decisive. Clearly, the historical practice of recess judicial appointments is entitled to far less weight than the historical practice considered in Marsh; despite the age of the practice, it teaches us very little, if anything, about the Framers’ intentions. I see no reason why the executive’s practice of using the recess appointment power to fill judicial vacancies should be entitled to any more weight than the practice held unconstitutional in Chadha.
V. CONCLUSION
To summarize the results of the four-part inquiry, the first two steps — a review of the text of the Constitution and the contemporaneous writings of the Founders — offer little guidance for our decision. The two remaining factors — constitutional values and historical practice — come down on opposite sides of the scale, but the principles of separation of powers and judicial independence that animate Article III heavily outweigh the concerns of expediency and efficiency that underlie the Recess Appointments Clause. With the scales tipped sharply in favor of Article III by the fundamental constitutional values at stake, the historical practice fails to provide enough insight into the intentions of the Framers to restore the balance, much less tip it in favor of the Recess Appointments Clause. In the last analysis, like Professor Hart, “I *1033 cannot believe that the Constitution contemplates that any Federal judge ... should hold office, and decide cases, with all these strings tied to him.”
I recognize that the only other court that has considered the question we decide today reached the same result as the majority. In United States v. Allocco, 305 F.2d 704 (2d Cir.1962), the Second Circuit also held that the Recess Appointments Clause carves out an exception to Article III.[17] Like today’s majority, however, the Second Circuit assumed without analysis that historical practice was dispositive of the question.
The path chosen by our court and the Second Circuit in Allocco is a tempting one. Our burden would be far lighter if we could avoid the trying task of weighing constitutional values against historical practice in a struggle to interpret the Constitution faithfully. Simple deference to historical practice is an easy way to resolve deep conflicts.
Although a serious clash between historical practice and constitutional principle may be a rare occurrence, we are not without guidance from the Supreme Court as to how we should proceed. Our enterprise today is part of a long tradition of constitutional interpretation, one that has always involved the evaluation of both constitutional values and historical practice. In Chadha, the Court interpreted the Constitution so that its fundamental purposes would be fulfilled, despite the intimidating reality of a longstanding historical practice. In Marsh v. Chambers, the Court deferred to a practice that reflected the Framers’ carefully considered assessment of its constitutionality. In Brown v. Board of Education, where individual rights were at stake, the Court chose fundamental constitutional values over a deeply rooted and intractable historical practice. Thus, the lesson of our constitutional history is that historical practice is but one guide to constitutional meaning. When a fundamental constitutional value is in conflict with historical practice, the Constitution must triumph and practice must give way to principle.
Today we must choose between Article III and the Recess Appointments Clause. We must also choose between deference to the historical practice of many chief executives and vindication of the fundamental constitutional values of judicial independence and separation of powers. These choices are not easy, but they must be made. And when we choose with reverence for the Constitution and respect for our proud heritage of constitutional interpretation, our choices are ultimately clear. The fundamental principle of separation of powers must prevail over a peripheral concern for governmental efficiency, and core constitutional values must prevail over uncritical acceptance of historical practice.

. It was not until United States v. Allocco, 305 F.2d 704 (2d Cir.1962), that the question was apparently first presented to an Article III court for decision. See Part V infra.

. The two law review treatments of the question, both student notes, also agree that the issue cannot be resolved by reference to the constitutional text alone. See Note, Recess Appointments to Article III Courts: The Use of Historical Practice in Constitutional Interpretation, 84 Colum.L.Rev. 1758, 1766 (1984) [hereinafter cited as Note, Historical Practice ]; Note, Recess Appointments to the Supreme Court— Constitutional But Unwise?, 10 Stan.L.Rev. 124, 130 (1957) [hereinafter cited as Note, Recess Appointments ].

. The Federalist, No. 67, (A. Hamilton) (Modern Library ed. 1937) [Hereinafter, all references to The Federalist are to the Modern Library edition.], refutes the specious argument by anti-federalists that the President would be empowered by the Recess Appointments Clause to make interim appointments to the Senate.

. The Columbia Note expressed the conclusion as follows: "In short, the evidence is overwhelming that the framers accorded a central role to article Ill's tenure and salary provisions in ensuring judicial independence and thereby contributing to the constitutional scheme of separation of powers.” Note, Historical Practice, at 1767-68.

. The Columbia Note acknowledges the limited force of Randolph’s remarks: "These postcon-vention changes in position undercut any attempt to attribute Randolph's initial understanding of the recess appointments clause to the framers as a group.” Note, Historical Practice at 1772 n. 79.

. In striking the balance, the Court charts a course of neutrality that attempts to preserve the values of autonomy and freedom of religious bodies while avoiding any semblance of established religion. For example, in Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), the Supreme Court decided whether the Higher Education Facilities Act of 1963, authorizing aid to church-related institutions, violated either the Establishment Clause or Free Exercise Clause of the First Amendment. The Court framed its inquiry as follows: "First, does the Act reflect a secular legislative purpose? Second, is the primary effect of the Act to advance or inhibit, religion? Third, does the administration of the Act foster an excessive government entanglement with religion? Fourth, does the implementation of the Act inhibit the free exercise of religion?” Id. at 678, 91 S.Ct. at 2096. Thus, although the Court did not explicitly state its approach, it resolved the conflict by examining the Act in light of the values underlying both constitutional provisions.

. I recognize that whenever possible we should strive to reconcile an apparent conflict in the Constitution. A classic statement of this principle follows:
What then, becomes the duty of the court? Certainly, we think, so to construe the constitution, as to give effect to both provisions, so far as it is possible to reconcile them, and not to permit their seeming repugnancy to destroy each other. We must endeavor so to construe them, as to preserve the true intent and meaning of the instrument.
Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 393, 5 L.Ed. 257 (1821). As Chief Justice John Marshall stated in Marbury v. Madison, "It cannot be presumed, that any clause in the constitution is intended to be without effect; and therefore, such a construction is inadmissible, unless the words require it.” 5 U.S. (1 Cranch) 137, 174, 2 L.Ed. 60 (1803). In the present case, however, we confront an unavoidable conflict between two provisions of the Constitution. No accommodation is possible; one clause must yield to the other with respect to judicial appointments. Of course, construing the Recess Appointments Clause not to apply to the judiciary would not render it meaningless; it would still apply with full force to appointments to executive agencies.

. There is extensive scholarly commentary on the relationship between judicial independence and the principle of separation of powers. See generally G. Wood, The Creation of the American Republic, 1776-1787, 453-63 (1969); Levi, Some Aspects of Separation of Powers, 76 Colum.L.Rev. 371 (1976); Note, Federal Magistrates and the Principles of Article III, 97 Harv.L. Rev. 1947, 1949 (1984).

. The Columbia Note agrees: "At no time during this early period did opposition to the practice make its way into the public record, either in Congress or the courts.” Note, Historical Practice, at 1776.

. For the same reason, the majority’s observation that individual judges did not object to their own recess appointments is of little consequence. The recess appointee has no formal opportunity and little incentive to consider in *1028 depth the constitutionality of his own appointment.

. Despite broad language in Curtiss-Wright to the effect that "an impressive array of legislation ... enacted by nearly every Congress from the beginning of our national existence ... must be given unusual weight,” 299 U.S. at 327, 57 S.Ct. at 224, a careful examination of Justice Sutherland’s opinion reveals that the historical factor was invoked only after a long and careful analysis of constitutional policies and values. Indeed one influential commentator described the opinion as "theoretical” and observed that, ”[a]lthough the decision might have been bottomed upon narrower grounds, Justice Sutherland accepted the case as an invitation to propound certain of his long-held convictions about the source and distribution of the federal government’s foreign affairs power.” L. Tribe, American Constitutional Law § 4-2, at 159 (1978). Curtiss-Wright is not authority for the proposition that longstanding historical practice should be decisive and end further inquiry into fundamental constitutional values. Quite the contrary, Curtiss-Wright stands squarely in the tradition of careful constitutional interpretation that necessarily involves close scrutiny of the values that animate the provisions of the Constitution.
Similarly in J. W. Hampton, Chief Justice Taft undertook a careful analysis of the policies and principles underlying the separation of powers and concluded that Congressional delegation of the power to fix certain tariff rates was consistent with those principles. 276 U.S. at 405-411, 48 S.Ct. at 350-353. Only after that inquiry was complete did Chief Justice Taft turn to a consideration of historical practice. Id. at 412, 48 S.Ct. at 353. Again a close reading of the decision leads to the conclusion that the process of constitutional interpretation is not complete absent careful attention to constitutional values and principles.

. Moreover, all of the cases cited by the Columbia Note in support of the structural accommodation theory involve the relationship between the political branches — the executive and the legislature — and not the independence of the judiciary. See Note, Historical Practice, at 1778-80. For example, the Pocket Veto Case, 279 U.S. 655, 49 S.Ct. 463, 73 L.Ed. 894 (1929), involved the longstanding practice of Presidents of using pocket vetoes to avoid Congress’ override power. Dames & Moore v. Regan, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981), concerned the authority of the President to settle claims by United States nationals against Iran in the absence of explicit Congressional authorization. McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), involved the power of Congress to create a national bank. Youngstown Sheet and Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), in which the structural accommodation argument was raised by Justice Frankfurter in dissent, implicated the President’s power to seize steel mills without authority delegated by Congress.

. Northern Pipeline Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1981), established the general principle that parties to a case or controversy in a federal forum are entitled to have the cause determined by judges with the salary and tenure guarantees of Article III. The Marathon Court cataloged three limited exceptions to that general principle: territorial courts, military tribunals, and "public rights" cases. 458 U.S. at 64-70, 102 S.Ct. at 2868-2871. See also Note, Historical Practice, at 1758.

. The Columbia Note argues that the personal rights component of Article III is secondary to its structural component. Note, Historical Practice, at 1788-90. The Note acknowledges this court’s decision in Pacemaker, id. at 1788 & n. 174, but argues that the fact that a litigant can raise the lack of Article III judicial power for the first time on appeal and the fact that a court may raise the issue sua sponte are evidence that *1031 a jurisdictional and not a personal claim is involved. This argument is clearly fallacious. The fact that a claim of lack of Article III power shares some characteristics with jurisdictional claims does not demonstrate that it does not share other characteristics with personal claims. For example, in Pacemaker our court relied on individual consent to validate the Magistrates Act, but waivability is a characteristic of personal rights and not jurisdictional requirements. Pacemaker makes the law in this circuit clear: a claim that an adjudication made in violation of the salary and tenure provisions of Article III is both a personal claim and a jurisdictional one.

. Another individual liberties case involving a clash between historical practice and constitutional values is Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941). Bridges also resembles the case we decide today because the Court was similarly faced with a conflict between two provisions of the Constitution. In Bridges the Court confronted the apparent conflict between a state’s interest in assuring criminal defendants a fair and impartial trial as supported by the Sixth Amendment and the First Amendment’s guarantee of freedom of the press. A California trial court had punished as contempt the publication of a newspaper editorial and a telegram criticizing its proceedings in labor dispute. As Justice Black wrote, “If the inference of conflict ... be correct, the issue before us is of the very gravest moment. For free speech and fair trials are two of the most cherished policies of our civilization, and it would be a trying task to choose between them.” Id. at 260, 62 S.Ct. at 192.
The approach of today’s majority to the resolution of such a conflict — deference to historical practice — was suggested by Justice Frankfurter in his dissent. He believed that the case could be resolved by recourse to “the uninterrupted course of constitutional history .... ” Id. at 279, 62 S.Ct. at 201 (Frankfurter J., dissenting). Justice Frankfurter traced the authority of the courts to impose prior restraints on the press through the contempt power back to the common law which "was written into the Judiciary Act of 1789 ... by Oliver Ellsworth, one of the framers of the Constitution.” Id. at 285, 62 S.Ct. at 204. The Bridges majority rejected this contention, focusing on the values the framers were attempting to realize in the First Amendment freedom of speech and of the press. Id. at 264-65, 62 S.Ct. at 194-95. While never explicitly resolving the potential conflict between free press and fair trial, the Court found that the extrajudicial statement did not represent “a clear and present danger” of interference with the administration of justice, and hence found the imposition of contempt to violate the First Amendment. Id. at 272-73, 62 S.Ct. at 198-99.

. The majority also cites Stuart v. Laird, 5 U.S. (1 Cranch) 298, 2 L.Ed. 115 (1803), but as in Curtiss-Wright and J.W. Hampton, the historical practice considered in Stuart v. Laird does not implicate individual constitutional rights. Stuart v. Laird is a one page opinion by Justice Patterson involving the question of whether Justices of the Supreme Court could also serve as circuit justices, consistent with the constitutional limitations of the original jurisdiction of the Supreme Court. Justice Patterson responded, “To this objection, which is of recent date, it is sufficient to observe, that practice, and acquiescence under it, for a period of several years, commencing with the organization of the judicial system, affords an irresistable answer, and has indeed fixed the construction.” Id. 5 U.S. (1 Cranch) at 309. The practice, however, had already been eliminated by amendment of the Judiciary Act in 1801, and Justice Patterson’s final observation was, "Of course, the question is at rest, and ought not now to be disturbed.” Id. Although Justice Patterson’s terse remarks are somewhat cryptic, they surely cannot be read to foreclose consideration of constitutional values when a longstanding historical practice is challenged.

. Significantly, the Allocco decision in 1962 was made without the benefit of the Supreme Court’s recent decisions in Chadha, Marsh, and Marathon. The two student notes reach the same result as today’s majority and the Second Circuit in Allocco. See Note, Historical Practice; Note, Recess Appointments.